IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:12-CV-269-FL

| | | |
|---|---|---|
| LISA HUDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff challenges the final decision of defendant Acting Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB") on the grounds that she is not disabled. The case is before the court on the parties' motions for judgment on the pleadings (D.E. 25, 31). Both filed memoranda in support of their respective motions (D.E. 26, 32), plaintiff filed a response to the Commissioner's motion (D.E. 33), and the Commissioner filed a reply (D.E. 34). The motions were referred to the undersigned Magistrate Judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket Entry dated 1 Aug. 2013). For the reasons set forth below, it will be recommended that plaintiff's motion be allowed, the Commissioner's motion be denied, and this case be remanded.

I.    BACKGROUND

A.    Case History

Plaintiff filed an application for DIB on 26 January 2010 alleging the onset of disability on 1 May 2009. Transcript of Proceedings ("Tr.") 19. The application was denied initially and upon reconsideration, and a request for hearing was timely filed. Tr. 19. On 13 September 2011,

a hearing was held before an Administrative Law Judge ("ALJ"). Tr. 27-51. The ALJ issued a decision denying plaintiff's claim on 13 October 2011. Tr. 19-26. Plaintiff timely requested review by the Appeals Council. Tr. 15. On 27 July 2012, the Appeals Council denied the request for review. Tr. 1-5. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. § 404.981. Plaintiff commenced this proceeding for judicial review on 17 September 2012, pursuant to 42 U.S.C. § 405(g). (*See In Forma Pauperis* Mot. (D.E. 1), Order Allowing Mot. (D.E. 4), Compl. (D.E. 5)).

**B.  Standards for Disability**

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id*. 423(d)(3).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R. § 404.1509] ["Listings"], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. § 404.1520(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

### C.     Findings of the ALJ

Plaintiff was 42 years old on the alleged onset date of disability and 46 years old on the date of the hearing. *See* Tr. 25 ¶ 7. She has at least a high school education. Tr. 25 ¶ 8; 106.

Her past relevant work includes employment as a dispatcher, administrative assistant, and clerical worker. Tr. 25 ¶ 6.

Applying the five-step analysis of 20 C.F.R. § 404.1520(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since 1 May 2009, the date of the alleged onset of disability. Tr. 21 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: schizoaffective disorder and anxiety disorder. Tr. 21 ¶ 3. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or equals one of the Listings. Tr. 21-22 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform a full range of work at all exertional levels subject to the following nonexertional limitations:

> [Plaintiff] is limited to simple, routine, and repetitive tasks that do not require fast-paced production or rigid quotas; can have occasional interaction with the general public, co-workers, and supervisors; and must avoid hazards.

Tr. 23 ¶ 5. At step four, the ALJ found that plaintiff was unable to perform past relevant work. Tr. 25 ¶ 6. At step five, the ALJ accepted the testimony of a vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of cleaner, garment folder, and ticket tagger. Tr. 26 ¶ 10. The ALJ accordingly concluded that plaintiff was not disabled. Tr. 26 ¶ 11.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See*

*Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See, e.g., Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales,* 402 U.S. at 401.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano,* 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

**B.    Overview of Plaintiff's Contentions**

Plaintiff contends that the ALJ's determinations on her RFC and ability to perform various occupations are not supported by substantial evidence.  The court finds that because of errors by the ALJ, including a number of specific errors cited by plaintiff,[1] it cannot determine whether the ALJ's decision is supported by substantial evidence or based on proper legal standards.  This case must accordingly be remanded.  To assure full and proper consideration of the record on remand, the court addresses below the most significant errors by the ALJ.

**C.    The ALJ's Failure to Adequately Address the Opinions of the Medical Sources**

**1.    Applicable Legal Standards**

It hardly bears repeating that an ALJ is required to consider all relevant evidence and to sufficiently explain the weight he gives to probative evidence.  *See Sterling*, 131 F.3d at 439-40; *DeLoatche*, 715 F.2d at 150.  Social Security Ruling 96-8p also requires the adjudicator to provide a narrative discussion to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Soc. Sec. R. 96-8p, 1996 WL 374184, at *7 (2 July 1996).  With respect to mental impairments, the assessment of functional limitations is "a complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [a claimant's] overall degree of functional limitation."  20 C.F.R. § 404.1520a(c)(1).  Specifically, an ALJ is required to "consider all relevant and available clinical signs and laboratory findings, the effects of [a claimant's] symptoms, and how [a claimant's] functioning may be affected by factors including,

---

[1]  Plaintiff contends specifically that the ALJ failed to adequately assess the opinions of one of plaintiff's treating psychiatrist, Herbert Harris, M.D., Ph.D.; state consulting examiner, Deborah Taylor, Psy.D.; and two state agency psychologists.  (*See generally* Pl.'s Mem. 16-22).  Plaintiff also asserts that the ALJ failed to adequately assess plaintiff's credibility.  (*See id.* at 22-25).

but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

Additional standards apply to the evaluation of the opinions of medical sources. Under the Regulations, medical opinions are defined as "statements from physicians [including psychiatrists] . . . or other acceptable medical sources[2] that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* § 404.1527(b); *Nicholson v. Comm'r of Social Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D. W. Va. 2009) ("Pursuant to 20 C.F.R. § 404.1527(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

The Regulations provide that opinions of treating physicians, including psychiatrists, on the nature and severity of impairments are to be accorded controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *see Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec. R. 96-2p, 1996 WL 374188, at *2 (2 July 1996). The reason is that the treating sources are likely to be those "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If a

---

[2] "Acceptable medical sources" means licensed physicians and licensed or certified psychologists and, for certain specified purposes, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

medical opinion of the treating source is not given controlling weight, the Regulations prescribe factors to be considered in determining the weight to be ascribed: the length of the treating relationship and frequency of the visits; the consistency of the opinion with other evidence; the extent of relevant supporting evidence presented by the source; the sufficiency of the explanation provided for the opinion; any relevant specialization of the sources; and any other factors tending to support or refute the opinions. Soc. Sec. R. 06-03p, 2006 WL 2329939, at *4-5 (9 Aug. 2006) (citing 20 C.F.R. § 404.1527(d)). An ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. R. 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. § 404.1527(d)(2). Opinions from medical sources on the ultimate issue of disability and other issues reserved to the Commissioner are not entitled to any special weight based on their source. *See* 20 C.F.R. § 404.1527(e); Soc. Sec. R. 96-5p, 1996 WL 374183, at *2, 5 (2 July 1996). But these opinions must still be evaluated and accorded appropriate weight. *See id.* at *3.

The same factors used to determine the weight to be accorded the opinions of physicians (and other acceptable medical sources) apply to the opinions of providers who are deemed to be at a different professional level (or so-called "other sources"), such as psychological counselors or therapists and physician's assistants. *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *4; *see also* 20 C.F.R. § 404.1527(d). As with opinions from physicians, the ALJ must explain the weight given opinions of other sources and the reasons for the weight given. *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *6 ("[The ALJ] generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the

determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."); *Napier v. Astrue*, No. TJS-12-1096, 2013 WL 1856469, at *2 (D. Md. 1 May 2013) ("[T]he ALJ is required to 'explain in the decision the weight given to . . . any opinions from treating sources, non-treating sources, and other non-examination sources who do not work for the [the Social Security Administration].").

The Regulations further require the ALJ to consider the opinions of any state agency medical or psychological consultants. 20 C.F.R. § 404.1527(e)(2). The weight ultimately attributed to medical opinions of non-examining sources depends on the same factors, to the extent applicable, used to evaluate the medical opinions of treating sources. 20 C.F.R. § 404.1527(e)(2)(ii). Significantly, "[u]nless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . ." *Id*; *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *2 (stating that ALJs "may not ignore these opinions and must explain the weight given to these opinions in their decisions").

## 2.    Analysis

The ALJ failed to adhere to the foregoing standards. After the alleged onset of disability on 1 May 2009, plaintiff received treatment from at least eight individual providers at three practice groups, underwent one comprehensive consultative psychological examination, and was evaluated by two non-examining consultants. Nevertheless, in his decision, the ALJ discusses the assessments of only four of these providers and evaluators. Moreover, with one exception, the assessments the ALJ discusses are supportive of his decision. The ALJ thereby leaves

unaddressed most of the medical evidence tending to support plaintiff's allegations of disabling impairments.

The assessments the ALJ did discuss include that by state agency consulting psychologist Deborah Taylor, Psy.D., who examined plaintiff on 14 April 2010. *See* Tr. 24 ¶ 5; 280-84. The ALJ pointed out, among other things, that at the examination plaintiff denied delusions and hallucinations, and Dr. Taylor suggested feigning by plaintiff based on "some curious responses" by her. Tr. 24 ¶ 5. The ALJ further noted that Dr. Taylor gave plaintiff a Global Assessment of Functioning ("GAF")[3] score of 67, generally indicating non-disabling symptoms. Tr. 24 ¶ 5.

The ALJ also discussed the assessment of psychiatrist Daniel Pistone, M.D. of Evergreen Behavioral Management, Inc. ("Evergreen"), who saw plaintiff once on 17 May 2010. *See* Tr. 24 ¶ 5; 286-89. The ALJ noted Dr. Pistone's observations that plaintiff "did not look depressed at all" and "appeared 'utterly relaxed.'" Tr. 24 ¶ 5. He further observed that Dr. Pistone "was

---

[3] The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000) ("DSM-IV-TR"). Selected GAF scores have the following meanings:

80-71 If symptoms are present they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning.

70-61 Some mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

60-51 Moderate symptoms OR moderate difficulty in social, occupational, or school functioning in social, occupational, or school functioning.

50-41 Serious symptoms OR any serious impairment in social, occupational, or school functioning.

40-31 Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . .

DSM-IV-TR 34.

unable to substantiate anything resembling a mood disorder or anxiety disorder" and gave her a GAF score of 60, which also generally signifies non-disabling symptoms. Tr. 24 ¶ 5.

The ALJ additionally discussed the three visits plaintiff had with psychiatrist Sid Hosseini, D.O. of Evergreen. *See* Tr. 24 ¶ 5. The ALJ noted that in a mental status examination of plaintiff on 21 September 2010, Dr. Hosseini found that she was able to express herself well, had no abnormal involuntary movements, and was oriented to date and time, but had limited insight and judgment. Tr. 24 ¶ 5; 312-14. The ALJ further stated that Dr. Hosseini diagnosed her with, among other conditions, mood disorder, NOS[4] and psychosis, NOS; started her on Invega, an antipsychotic medication used for the treatment of schizophrenia;[5] and gave her a GAF score of 55, again not usually indicative of disabling symptoms. Tr. 24 ¶ 5. The ALJ further found that in a follow-up visit with Dr. Hosseini on 16 November 2010, plaintiff reported that her mood was stable. Tr. 24 ¶ 5; 333. In her final visit of record with Dr. Hosseini on 5 April 2011, the ALJ noted that plaintiff reported she had been out of Invega for two weeks and that it had not been working, and that she insisted on receiving another drug Dr. Hosseini declined to prescribe for her, Klonopin, which is used for treatment of panic disorder.[6] Tr. 24 ¶ 5; 357.

The treating sources whose assessments the ALJ did not discuss include Sharon D. Davis, MSW, LCSW, of Evergreen. (Tr. 290, 292-96, 301). She saw plaintiff on 19 April 2010, approximately one month before Dr. Pistone. LCSW Davis found plaintiff's affect to be sad, her mood to be depressed, anxious, fearful, sad, and frustrated, and her insight to be poor. Tr. 295.

---

[4] NOS, *i.e.*, "not otherwise specified," is used when, among other circumstances, "[t]he [individual's] presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders." DSM-IV-TR 4.

[5] *See* entry for "Invega," http://www.drugs.com/search.php?searchterm=invega (last visited 3 Dec. 2013).

[6] *See* entry for "Klonopin," http://www.drugs.com/search.php?searchterm=klonopin (last visited 3 Dec. 2013).

LCSW Davis also noted that plaintiff was "very tearful in the office and crying" during the examination, reported auditory hallucinations, and exhibited both short- and long-term memory problems. Tr. 295. Based upon her mental examination, LCSW Davis diagnosed plaintiff with "Major Depressive Disorder, recurrent episodes, severe, specified as with psychotic behaviors." Tr. 296. She determined that plaintiff had a GAF of 50, generally signifying serious impairment, and that she needed treatment in the form of medication management by a psychiatrist, individual outpatient counseling, and the services of a community support team. Tr. 296. She also concluded that plaintiff was at "very high risk" for danger to herself. Tr. 296.

On 8 June 2010, LCSW Davis provided plaintiff with a 45-minute therapy session aimed at the goals of a "decrease in depressive symptoms as evidenced by: being able to sleep at least 5 hours per night, no more than 1 psychotic symptom per week, decreased crying spells 3x per week, decreased agitation by being able to cooperate with others and family members . . . ." Tr. 290. In addition to providing plaintiff with cognitive behavioral therapy during the session, LCSW Davis prescribed her medications for anxiety and insomnia. Tr. 290. At a subsequent therapy session two weeks later, LCSW Davis noted that she had difficulty initially assessing plaintiff's symptoms because plaintiff was "too upset" and that plaintiff had a crying episode during the session and reported auditory hallucinations. Tr. 301. LCSW Davis concluded that plaintiff should "be monitor[ed] for safety, and or set-back in mental stability." Tr. 301.

Another source not mentioned by the ALJ was Evergreen psychiatrist Mark Livingston, M.D. He saw plaintiff on 20 July 2010, one month after her visit with LCSW Davis. Dr. Livingston found that plaintiff exhibited a depressed mood and an affect that was restricted in range, flat, and labile. Tr. 299. He further noted that she was tearful at times during the visit, reported hallucinations, and exhibited paranoia. Tr. 299. He added to the diagnoses by LCSW

Davis bipolar disorder, NOS and possible (*i.e.*, "rule out")[7] post-traumatic stress disorder, and recommended that she consider hospitalization. Tr. 299. He further determined that she should begin using a new medication after she receives Medicaid benefits. Tr. 299.

The ALJ additionally failed to discuss the plaintiff's treatment records from ACT Medical Group ("ACT"), where plaintiff sought treatment on 22 July 2010. Plaintiff decided to seek treatment at ACT because LCSW Davis had left Evergreen, and ACT was closer to her home. Tr. 307. The initial intake assessment by ACT reflects substantially the same diagnoses and findings of LCSW Davis, but found plaintiff to have a GAF of 40, generally indicative of inability to work. Tr. 307-10. After evaluating plaintiff on 3 August 2010, physician's assistant John Blake, PA-C changed the diagnosis for plaintiff to schizoaffective disorder depressive type and found her to have a current GAF of 35. Tr. 306. He also started her on new medications. Tr. 306.

The ALJ further failed to address the comprehensive clinical assessment of plaintiff performed by a clinician/therapist when plaintiff first sought treatment from Community Innovations, Inc. ("Community") on 9 September 2010. Tr. 323-24. Among a variety of other symptoms, the clinician/therapist assessed plaintiff as exhibiting: flat, depressed, agitated mood and poor eye contact; illogical and loose thought form, flight ideas, and distractibility; visual and auditory hallucinations; panic attacks three or more times per week; and a variety of depressive symptoms. Tr. 323-24. He diagnosed her with dysthymic disorder (*i.e.*, a chronic depressive mood disorder), late onset, with related insomnia, and borderline personality traits. Tr. 328. He assessed her current GAF as 50, which, as indicated, generally indicates serious impairment. Tr. 328.

---

[7] *See, e.g.*, Carlton E. Munson, Ph.D., The Mental Health Diagnostic Desk Reference 78-79 (2d ed.2001).

In addition, the ALJ did not discuss the records of Community psychiatrist Jesse Cavenar, Jr., M.D., who saw plaintiff on 1 June 2011. At that time, plaintiff complained of anxiety and difficulty sleeping, although she had been unable to obtain some of her medications when her unemployment benefits expired. Tr. 351. He found her to be coherent and logical with no evidence of thought disorder or psychosis, but having somewhat compromised judgment and insight. Tr. 356. He diagnosed her with schizoaffective disorder depressed phase. Tr. 351. Dr. Cavenar gave plaintiff some medication samples and planned for her to follow up in a month, when he anticipated her unemployment or disability benefits situations being resolved and thereby her being better able to pay for her medications. Tr. 351.

By not discussing the assessments by these various treatment providers, the ALJ failed to meet his obligation to make clear the weight he gave to their opinions. Moreover, his silence regarding them raises the question whether he even considered this evidence, notwithstanding his boilerplate representations that he considered all the evidence. Tr., *e.g.*, 19 ("After careful consideration of all the evidence . . . ."); 21 ("After careful consideration of the entire record . . . ."); 23 ¶ 5 (same). Further, by omitting any mention of most of the medical evidence supportive of plaintiff's allegations, the ALJ appears to have engaged in impermissible "cherry picking." *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("[B]y cherry-picking [a treatment provider's] file to locate a single treatment note that purportedly undermines her overall assessment of [claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness.").

As noted specifically by plaintiff, the ALJ also failed to discuss the opinions of the two state agency psychologists who completed mental RFC assessments of plaintiff, Tovah M. Wax, Ph.D. on 6 July 2010 (*see* Tr. 57-59) and Jennifer Fulmer, Ph.D. on 20 August 2010 (*see* Tr. 68-

70).  Because the ALJ did not give controlling weight to any treating source in this case, he was required to discuss the weight he gave to the mental RFC assessments of Drs. Wax and Fulmer. *See* 20 C.F.R. § 404.1527(e)(2)(ii).

Although the opinions of the non-examining consultants are generally supportive of the ALJ's decision, that fact does not excuse the ALJ's failure to make clear the weight he accorded them.  As with the opinions of the treating and examining sources, it is not clear that the ALJ even considered the opinions of the non-examining state agency consultants.

The ALJ did discuss the opinions of one provider that were adverse to the decision—those of Herbert W. Harris, M.D., Ph.D.  As the ALJ noted, Dr. Harris stated in a letter dated 14 December 2010 that plaintiff's ability to perform unskilled work is seriously impaired because of her pervasive symptoms.  Tr. 24 ¶ 5; 358.  The ALJ further pointed out that in an attached medical source statement Dr. Harris found, among other things, that plaintiff had marked limitations in social functioning; had deficiencies of concentration, persistence, or pace, resulting in frequent failure to complete tasks timely; and would experience repeated episodes of deterioration or decompensation in work or work-like settings causing her to withdraw or experience exacerbation of her signs and symptoms.  Tr. 24-25 ¶ 5; 359.

The ALJ stated that he gave little weight to the opinion that plaintiff suffers from marked limitations in social functioning, in part, because "[t]reatment notes demonstrate that [plaintiff] generally presented with a stable mood and obtained a GAF score of 67, which suggests a higher level of functioning than contemplated by Dr. Harris."  Tr. 25 ¶ 5.  The ALJ also pointed to Dr. Harris's examination of plaintiff on 16 November 2010, which the ALJ characterized as "essentially normal."  Tr. 25 ¶ 5.

There are ostensible problems with the ALJ's evaluation of Dr. Harris's opinions. Most notably, he did not address Dr. Harris's findings that plaintiff was markedly impaired in numerous specific functional areas bearing on her concentration, persistence, and pace. *See* Tr. 360. In addition, the GAF score of 67 was not assigned by a treating provider, as the ALJ apparently believed, but by a consulting examiner, Dr. Taylor. *See* Tr. 24 ¶ 5; 284. In any event, the fact that the ALJ did discuss one opinion supportive of plaintiff's allegations in no way excuses his failure to discuss the significant body of other such evidence.

Notwithstanding the ALJ's rejection of Dr. Harris's finding on social interaction, he states that he modified his RFC determination by "limit[ing] [plaintiff's] interaction with the public, co-workers, and supervisors in order to accommodate any limitation she may have in her social functioning." Tr. 25 ¶ 5. He goes on to say that "[a]lthough [plaintiff's] allegations of such significant limitations and pain were not fully consistent with the medical evidence of record, I accorded [her] the benefit of the doubt and further reduced the [RFC] to include his [sic] limitations as described above," adding that "I cannot find the claimant's allegations that he [sic] is incapable of all work activity to be credible because of significant inconsistencies in the record as a whole." Tr. 25 ¶ 5. The ALJ's modification of the RFC as described does not remedy his failure to adequately address the medical evidence. Indeed, in the absence of an adequate discussion of the medical evidence, the ALJ's apparent compromise of plaintiff's RFC to accommodate her allegations has an arbitrary tone.

The court concludes that the ALJ's failure to properly address the medical opinion evidence precludes the court from determining whether he considered all such evidence and, if he did, the weight he accorded it and the reasons why. The case must accordingly be remanded.

### D.     The ALJ's Failure to Adequately Develop the Record

The ALJ failed to develop the record regarding the proposed testimony of a friend of plaintiff's, Mary Jackson.  Plaintiff testified that she relied on Jackson for assistance with her daily activities, including driving her (because plaintiff's anxiety prevented her from driving), cooking meals, cleaning her house each week, and buying her groceries.  Tr. 33-35.  Similarly, in her request for hearing, plaintiff stated that "[her] girlfriend did a chart and she gives me a call to take baths, brush my teeth and comb my hair."  Tr. 210.[8]

Jackson was present at the hearing and available to testify as a witness for plaintiff.  Nonetheless, the ALJ solicited a stipulation from plaintiff's counsel that Jackson not testify.  His colloquy with plaintiff's counsel about the stipulation, which came after plaintiff's testimony, was as follows:

| | |
|---|---|
| ALJ: | Any other questions, any, anything further that you want to present? |
| ATTNY: | Well I have Ms. Jackson here if you'd like to hear from her regarding the -- |
| ALJ: | If it's corroborative of your client's testimony I'll -- |
| ATTNY: | Basically going to say what she said, she -- |
| ALJ: | --I'll -- okay.  Let's go ahead and take the vocational testimony.  We'll just enter a stipulation that should, what's the lady's name? |
| CLMT: | Her name is Mary Jackson. |
| ALJ: | Should Mary Jackson be called that she would corroborate the claimant's testimony. |

---

[8] Other evidence in the record supports plaintiff's need for such extensive assistance.  For example, the treatment plans developed for plaintiff by treatment providers consistently included community support services.  *See* Tr., *e.g.*, 358 (noting that plaintiff was "referred to the Community Support Team (CST), an intense, community-based program, due to the severity of her symptoms and needs," and that these services included "assistance with her life domain needs"); *see also* Tr. 273, 296, 306, 310, 328, 330, 353.

Tr. 45-46.  There was no objection by plaintiff's counsel to this proposed stipulation, although he never explicitly agreed to it,[9] and the ALJ proceeded with the testimony of the vocational expert. Jackson never testified.

"[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record . . . ."  *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  A case must be remanded for failure to develop the record "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant."  *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). Further, "[t]he duty to develop the record is heightened in cases where the claimant is mentally impaired."  *Dervin v. Astrue*, 407 Fed. Appx. 154, 156 (9th Cir. 2010).

By not taking the testimony of Jackson, the ALJ violated this duty and the violation was prejudicial to plaintiff.  Jackson had the unique opportunity, not shared by plaintiff's treatment providers or evaluators, to directly observe plaintiff in her daily life.  She might have provided additional material information about plaintiff's symptoms and functional abilities gained from her unique perspective.  In fact, the Listings for mental health impairments expressly recognize the need for testimony of family members and other persons who know a claimant "to *supplement* the record of [a claimant's] functioning in order to establish the consistency of the medical evidence and longitudinality of impairment severity."  Listing 12.00(D)(1)(c) (emphasis added); *see also Clifton v. Astrue*, Civil Action No. 1:10-cv-00417, 2011 WL 777889 at *9 (W.D. La. 8 Feb. 2011) (citing Listing 12.00(D)(1)(c) in admonishing the ALJ on remand to familiarize herself with the rules regarding a claimant's presentation of witnesses at a hearing where the ALJ gave claimant's father, for whom the claimant worked, only five minutes to

---

[9] The lack of objection by plaintiff's counsel does not preclude the court from considering the stipulation because, among other reasons, it resulted in a fundamental defect in the proceedings that precludes effective judicial review.

testify "because [the ALJ thought she could] get whatever [she had] to get from questioning the Claimant").

The stipulation that Jackson "would corroborate the claimant's testimony" is hardly a substitute for her actual testimony. Tr. 46. Among other reasons, this purported stipulation does not specify the particular testimony she would corroborate. In addition, the ALJ did not have the opportunity to evaluate her credibility firsthand.

Jackson's testimony would presumably have taken a matter of minutes to take. It is truly reprehensible that with Jackson present and available to testify the ALJ failed to spend this small amount of additional time to complete the record in this case.

Further, as plaintiff argues, the ALJ did not discuss the stipulation in his decision, thereby compounding his failure to take Jackson's testimony. Thus, there is no clarification of the scope of the stipulation in the decision. The weight the ALJ gave Jackson's corroboration is also unclear. For example, he found plaintiff not fully credible, in part, based on the lack of medical evidence substantiating her blinking out, that is, losing awareness of her activities for periods of time, about which she testified at length at the hearing. *See* Tr. 34. 38-39, 40. But if the stipulation extends to plaintiff's testimony about blinking out, plaintiff does not stand alone as reporting such episodes. It cannot be determined from the record what, if any weight, the ALJ gave the stipulation in evaluating this aspect of plaintiff's credibility that the ALJ found to be so important.

It is not just the ALJ's credibility analysis that is implicated by the failure to have Jackson testify. Jackson's testimony could have also shed light on the severity of plaintiff's symptoms and limitations for purposes of, among other aspects of the sequential analysis, the severity determination at step two and the RFC determination.

In sum, the ALJ's failure to develop the record adequately regarding the testimony of Jackson prejudiced plaintiff and precludes the court from determining whether substantial evidence supports his decision and it is based on proper legal standards. This failure accordingly constitutes an independent ground for remand.

### E.    Other Issues

#### 1.    The Longitudinal Record

Listing 12.00(D)(2) for mental impairments specifically emphasizes the "vital" need to consider longitudinal evidence in the evaluations of mental impairments especially in light of the fact that a claimant's "level of . . . functioning at a specific time may seem relatively adequate or, conversely, rather poor" and "[p]roper evaluation of [an] impairment(s) must take into account any variations in the level of . . . functioning in arriving at a determination of severity over time." Listing 12.00(D)(2). Here, the medical records before the ALJ covered not only the alleged disability period beginning in May 2009, but also the period back to 1994. *See generally* Tr. 229-74. The records contain considerable evidence that plaintiff had a history of continuous mental health impairments in the 15 years prior to the alleged disability period. *See* Tr*., e.g.*, 271 (treating psychiatrist noted in 2007 that plaintiff described "a fifteen year history of persistent mood problems"). Nevertheless, the ALJ failed to reference plaintiff's mental health history prior to the alleged onset of disability or any of the contemporaneous records documenting it. Thus, it is not clear that he even considered this evidence. On remand, the Commissioner should make clear her consideration of those relevant portions of plaintiff's mental health history predating the alleged date of onset of disability and the weight she accorded them.

### 2. Plaintiff's Ability to Afford Treatment

"[A] claimant may not be penalized for not seeking treatment she cannot afford." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986). The record contains considerable evidence that plaintiff has serious financial problems that, at least at times, interfered with her access to treatment. *See* Tr., *e.g.*, 36 (plaintiff testified that she was denied Medicaid), 271 (noting that plaintiff cannot afford her medication and borrows some from a friend), 273 (stating that plaintiff would apply to a patient assistance program for Zoloft), 316 (plaintiff stated that she was dealing with her symptoms herself because she could not afford a co-pay), 317 (plaintiff reported that her car insurance was cancelled because she could not afford the payment), 351 (plaintiff reported that she "has zero income and is unable to buy any medicine"); *see also* Tr., *e.g.*, 188, 209, 299, 304, 312, 314, 319, 328, 333, 357. Nonetheless, the ALJ does not address the issue expressly. He does note that the medical evidence following the alleged onset of disability is "relatively sparse," but it is not clear what, if any, inference he draws from this finding. Tr. 24 ¶ 5. On remand, the Commissioner should make clear the role plaintiff's financial status plays in her decision.

### 3. The Effectiveness and Side Effects of Plaintiff's Medications

The ALJ found that plaintiff "had previously been given lithium but that she was not compliant in taking it, which suggests that her symptoms *may* not be as severe as has been alleged." Tr. 24 ¶ 5 (emphasis added). The inference to which the ALJ alludes is arguably flawed for two reasons.

First, he does not state the inference definitively, but states it as a possibility. The extent to which he relied on this inference is thereby left in doubt.

Second, the ALJ does not address another possible explanation for plaintiff's non-compliance—namely, the side effects that plaintiff had reported in taking lithium. *See* Tr., *e.g.*, 208 (reporting that lithium was a "real downer" and caused her to "hear noises"); 312 (reporting to Dr. Hosseini that she was "was worried about taking medications" and that "[s]he could not take Lamictal, lithium or Geodon"); 313 (again reporting to Dr. Hosseini that she stopped taking lithium because she "did not like it"). On this record, he should have. *See* 20 C.F.R. § 404.1529(c)(3) (requiring, for mental impairments, that the ALJ consider "the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms"). The record indicates that plaintiff often stopped taking a variety of medications because of their side effects or their failure to alleviate her symptoms. *See, Tr. e.g.,* 241, 261, 271, 292, 294, 312, 313, 357. Accordingly, on remand the Commissioner should take care to ensure that she properly considers the effectiveness and side effects of plaintiff's medications and make clear her determinations on this issue.

## III.    CONCLUSION

For the foregoing reasons, the court cannot determine whether the ALJ's decision, including specifically his RFC determination and finding that plaintiff could perform various occupations, is supported by substantial evidence and based on proper legal standards. Accordingly, IT IS RECOMMENDED that plaintiff's motion (D.E. 25) for judgment on the pleadings be ALLOWED, the Commissioner's motion (D.E. 31) for judgment be DENIED, and this case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Recommendation.

In making this recommendation, the court expresses no opinion on the weight that should be accorded any piece of evidence. That is a matter for the Commissioner to decide.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have until 17 December 2013 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 3rd day of December 2013.

James E. Gates
United States Magistrate Judge